Filed 2/2/16  P. v. Rivera CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HECTOR EDUARDO RIVERA,<br><br>    Defendant;<br><br>FINANCIAL CASUALTY & SURETY,<br>INC.,<br><br>    Real Party in Interest and<br>    Appellant. | B257776<br><br>(Los Angeles County<br> Super. Ct. No. SJ003936) |

APPEAL from the judgment of the Superior Court of Los Angeles County. Rand S. Rubin, Judge.  Affirmed.

E. Alan Nunez and John M. Rorabaugh for Real Party in Interest and Appellant.

Ruben Baeza, Jr., Assistant County Counsel and Joanne Nielsen, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Financial Casualty & Surety, Inc. (surety) appeals from the entry of summary judgment following the trial court's denial of its motion to extend the period in which the forfeiture of bail for defendant Hector Eduardo Rivera could be set aside (Pen. Code, § 1305.4).[1] We affirm the judgment, finding the surety failed to demonstrate a reasonable likelihood of locating the defendant if it were granted an extension of time.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 23, 2013, the surety posted a $550,000 bond for defendant in his criminal case for drug distribution, sales, and possession while armed with a firearm (Health & Saf. Code, §§ 11378, 11379, 11370.1).[2] On October 28, 2013, when defendant failed to appear in court, the trial court ordered his bail forfeited. The trial court issued a bench warrant for defendant, and notice of the bail forfeiture was mailed to the surety. On May 16, 2014, the surety timely moved under section 1305.4 to extend the time for entry of summary judgment on the bail forfeiture.

In support of its motion, the surety's investigator, David Adams, submitted a declaration detailing his efforts to locate defendant. On November 16, 2013, he and another bail agent went to the home of defendant's father in Ontario, California. No one answered the door, so the agents spoke with apartment management employees, and showed them a picture of defendant. The employees had seen defendant at father's apartment about a month earlier.

The agents then went to father's place of employment. The agents explained to father that defendant had failed to appear in court and his bail had been forfeited. Father had not talked to defendant in over a month, and did not know where he was staying. Father promised to try and locate defendant and to contact the bail agents.

---

[1]     All statutory citations are to the Penal Code unless otherwise indicated.

[2]     Defendant's bail had been set in May 2013, but he remained in custody because a section 1275.1 hold had been placed on his release, which provides that "[b]ail . . . shall not be accepted unless a judge or magistrate finds that no portion of the consideration, pledge, security, deposit, or indemnification paid, given, made, or promised for its execution was feloniously obtained." (§ 1275.1, subd. (a).)

2

The bail agents then went to the Eastvale, California residence of the indemnitor on the bond application, Carlos Pallares. The agents saw a male through the home's side gate and asked if he was Carlos. The man "started cursing and acting like he was mentally off." The man's mother came outside and confirmed he was Carlos. She explained that he was suffering from traumatic stress from his service in the military. The bail agents showed Carlos's mother a picture of defendant, but she did not recognize him. She promised to call to discuss the matter at a later time, as she had to care for Carlos.

On November 17, agent Adams ran an investigation report in an "Investigator Database" and identified three addresses associated with defendant; one in Ontario, and two in El Monte, on Medina Court and on Baldwin Avenue.

On November 18, agent Adams and another bail agent conducted surveillance on the Baldwin Avenue address in El Monte. They did not see anyone come or go from the residence over an eight hour period. They spoke with neighbors and showed them a picture of defendant, but none of them recognized defendant. Agent Adams left copies of "Wanted Fugitive" fliers with some of the neighbors, and asked them to call him or local police if they saw defendant. The neighbors promised to do so.

On November 21, agent Adams and another bail agent conducted surveillance on the Medina Court address in El Monte over a period of 10 hours. They saw several Hispanic males entering and exiting the location, but none resembled defendant. They then went to several nearby motels to see if any motel employees recognized defendant. None of the motel employees recognized defendant from his Wanted Fugitive flier. Agent Adams left copies of Wanted Fugitive fliers at these locations and asked the employees to call him or local police if they saw defendant. They agreed to do so.

Between December 5 and December 14, agent Adams and another bail agent conducted over 100 hours of surveillance of father's apartment and the Medina Court address. They did not see defendant or obtain any leads about his whereabouts.

On December 8, agent Adams discovered the name of defendant's ex-girlfriend, Sandra Hinojosa, and her address in Whittier. He went to the Whittier address, and spoke

with a man there who reported that Ms. Hinojosa no longer lived there. Agent Adams left his business card, and asked the man to have Ms. Hinojosa contact him if he heard from her.

Ms. Hinojosa called agent Adams on January 8, 2014. She confirmed that she used to date defendant, but had not seen him in over two months. She had talked to defendant on the phone about a month ago. She did not have a phone number for defendant because he had called her from a blocked number. According to Ms. Hinojosa, defendant has been seen around Motel 6 locations in the area. Defendant did not have a vehicle; he would drive vehicles belonging to different friends. She had "no additional info[rmation] . . . that would lead to where the defendant is at." She agreed to call agent Adams if she obtained any new information about defendant.

On January 24, agent Adams and five other agents conducted a thorough search of father's apartment and vehicles. Father had not spoken to defendant in a couple of months. The agents questioned father for two hours, and told him they thought he was lying and told father he needed to cooperate with their investigation.

On February 4, agent Adams and other agents visited father at his work, and pulled him off the job to question him further about defendant's whereabouts. They asked if defendant had any friends he could be staying with. Father admitted that defendant had friends in El Monte, but he did not have any contact information. Father assured the agents he was trying to contact his son.

On February 9, agent Adams was conducting surveillance on the Baldwin Avenue address, and saw a man standing outside who resembled defendant. Additional agents were dispatched and the location was searched. Inside the residence were four Hispanic males and two females. Agent Adams realized the man he saw was not defendant. The agents showed the six people a picture of defendant. They denied that he lived at the location, but one of the females said she had seen defendant walking in the area.

During the remainder of the month of February, agent Adams and another bail agent visited several motels in the cities of West Covina, Baldwin Park, El Monte, and

4

Covina. They passed out Wanted Fugitive fliers and conducted surveillance of different motels, but found "no leads or signs of defendant."

Between March 9 and March 20, agent Adams conducted surveillance of father's home and the Medina Court address, but did not find defendant or any new leads.

On April 3, agent Adams again searched father's home, and told father to help find defendant. Father assured him that he was trying to locate defendant.

Ms. Hinojosa called agent Adams on April 9, asking agent Adams if he had any new leads on defendant. She had spoken to some mutual friends of hers and defendant's, "and is still trying to find out where the defendant is staying." She said she would call if she obtained information about defendant's whereabouts.

In opposition to the surety's motion, the District Attorney argued that the surety had not demonstrated due diligence or a reasonable likelihood that defendant would be captured if the surety was granted an extension. The People argued that the circumstances surrounding the issuance of the bond were suspect, making the surety's current representations about its efforts to locate defendant suspicious. The People presented the July 18, 2013 transcript of defendant's section 1275.1 hearing, where defendant was required to prove that no portion of the premium or collateral for the bond was obtained by felonious means to release the hold on his bond. The bail agent, Mr. Jacob Hunsicker, testified that the only collateral received for the bond were three pink slips, for a 2004 Audi and two 2004 work trucks. In order to approve the bond, the surety also required that defendant wear an ankle bracelet. The premium for the bond was being debited from father's account, over a period of six years.

The court expressed skepticism that the surety would issue such an under-collateralized bond. The bail agent explained that the surety issued the bond because the ankle bracelet would allow bail agents to know defendant's location at all times. The bail agent agreed that it was not "common to write bail bonds of this magnitude without any collateral, just based on . . . their collateral on an ankle bracelet."

The court expressed its concern that there was some sort of hidden illegal cash collateralizing the bond, or some side agreement between the defendant and the bail agent

5

or the surety, and stated, "I don't want the surety company coming in here if he skips and them saying we didn't know what was going on, or not coming in and saying -- shrugging their shoulders and playing it off because they have an agreement to pay half a million dollars." The court wanted additional evidence the surety had approved the bond, and found that defendant had not met his burden under section 1275.1. The hearing was continued to receive additional evidence.

Following the hearing, Anthony Hanson, ostensibly the owner of Bail Now Bail Bonds, wrote a letter to the court confirming that the terms of the bond were as the bail agent testified at the hearing, including the requirement that defendant wear an ankle bracelet. The court granted defendant's motion and vacated the section 1275.1 hold on August 20, 2013.

At the hearing on the surety's motion to extend the period in which the forfeiture could be set aside, the surety represented that the bond had been issued by mistake, and that it did not even know the bond was posted until it received notice of the forfeiture. The court stated its view that "either this was fraud and misrepresentation to the judge at the bond hearing or it's the worst business decision that I've ever seen of a bail bonds company, to put up this amount of bond, getting three pink slips on a car, or, if you believe that letter . . . $10,000 and three pink slips on three cars that are worth nothing."

Counsel for the surety represented that the surety had just retained an investigator who works with the U.S. Marshals. The investigator had met with U.S. Marshals on May 15, 2014, to see if they could "adopt the case" and was informed that defendant's arrest warrant needed to be upgraded to a national warrant instead of just a California warrant. But counsel did not believe that "that's a problem." Counsel requested a "short extension and I will give you an update at that time and see if we can have this on a more formal track to get this defendant back here . . . ."

The court concluded that defendant was "[g]one with the wind." The court denied the motion, finding "I don't think there has been [due] diligence. I don't think there's any reasonable likelihood that you will find this individual. It was almost like it's a set up for this individual to flee."

Summary judgment was entered on June 13, 2014.

## DISCUSSION

" 'The object of bail and its forfeiture is to insure the attendance of the accused and his obedience to the orders and judgment of the court.' " (*People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 657.) "When a person for whom a bail bond has been posted fails without sufficient excuse to appear as required, the trial court must declare a forfeiture of the bond. [Citation.]" (*Id.* at p. 658.) Once a notice of forfeiture is mailed by the clerk, a surety has 180 days within which to obtain relief from forfeiture or exoneration of bail. (§ 1305, subd. (c); *People v. Ranger Ins. Co.* (2002) 99 Cal.App.4th 1229, 1232, disapproved in part on other grounds in *People v. American Contractors Indemnity Co.*, at p. 663, fn. 7.)

This 180-day period is often referred to as the " 'appearance' period." (*People v. American Contractors Indemnity Co.*, *supra*, 33 Cal.4th at p. 657.) Under section 1305.4, the surety may file a motion for an order extending the appearance period. (§§ 1305, subd. (j), 1305.4.) " 'In order to show good cause for an extension, the surety must demonstrate that it diligently attempted to locate and capture the defendant during the initial 180 days.' [Citation.]" (*People v. Ranger Ins. Co.* (2007) 150 Cal.App.4th 638, 644.) The surety must also demonstrate there is a reasonable likelihood of securing the attendance of the accused. (*People v. Accredited Surety & Casualty Co., Inc.* (2006) 137 Cal.App.4th 1349, 1358 (*Accredited*).)[3] "Given the underlying policy of avoiding forfeitures in favor of bringing defendants before the court, a trial court, faced with a section 1305.4 motion for extension, should draw all inferences in favor of the surety. [Citation.] The good cause showing under section 1305.4 is a low threshold for the

---

[3]    The California Supreme Court recently granted review in two cases to determine whether the good cause standard under section 1305.4 requires a demonstration of a reasonable likelihood of success of returning the fugitive. (See *People v. Accredited Surety & Casualty Co., Inc.* (2015) 239 Cal.App.4th 293, review granted Oct. 28, 2015, S229271; *People v. Financial Casualty & Surety, Inc.* (2015) 239 Cal.App.4th 440, review granted Oct. 28, 2015, S229446.)

7

movant." (*Ibid*.) If the forfeiture is not set aside by the end of the appearance period, the court is required to enter summary judgment against the surety. (*People v. American Contractors Indemnity Co*., at p. 657.)

We review the trial court's denial of a motion to extend the appearance period under an abuse of discretion standard. (*People v. Ranger Ins. Co*. (2000) 81 Cal.App.4th 676, 679.) "[S]uch abuse occurs only where the court's decision ' "exceeds the bounds of reason, all circumstances being considered. [Citation.]" ' " (*Id.* at pp. 679-680.)

The surety contends the trial court abused its discretion when it denied its request for an extension, because "the trial court failed to properly construe the spirit and the letter of the law and violated the surety's right to the benefit of relief from forfeiture to which it was entitled." The surety contends that the investigator's declaration detailed reasonable and diligent efforts to locate defendant, and that with the cooperation of defendant's father and ex-girlfriend, defendant's "capture was more than likely." According to the surety, the trial court was "improperly concerned with the circumstances under which the bond was posted." Respondent concedes that the surety's investigator was diligent, but argues that the surety presented no evidence that defendant's capture was reasonably likely.

We agree the surety's investigator was diligent in trying to locate defendant. However, there is no evidence the surety was likely to bring defendant into custody if granted an extension. The investigator's declaration was completely silent about whether defendant could be apprehended if more time was granted. Other than vague promises by defendant's father and ex-girlfriend that they would attempt to locate defendant, and a statement by one occupant of a home associated with defendant that she had seen him in the neighborhood (with no indication of *when* this occurred), there was no evidence that the investigator was any closer to locating defendant than when he began the search in November 2013, or that defendant's capture was reasonably likely.

None of the cases on which the surety relies convinces us otherwise. (See *Accredited*, *supra*, 137 Cal.App.4th 1349; *People v. Alistar Ins*. *Co.* (2003) 115 Cal.App.4th 122 (*Alistar*).) In *Accredited*, the Court of Appeal found an abuse of

discretion in the denial of the surety's section 1305.4 motion because the investigator knew where the defendant resided at various times, with whom he associated, what actions the defendant had taken, and had received detailed tips about the defendant's current whereabouts. The surety had twice been hot on the defendant's trail, and had obtained the help of local authorities to capture the defendant. The investigator had also hired a fugitive recovery specialist and California Patrol Agency to help him. (*Accredited,* at pp. 1352-1354, 1359.)

Similarly, in *Alistar*, the surety had found a new address for the defendant and obtained the help of local police. The behavior of the defendant's family members strongly indicated that he was in the area, and that the family members were in contact with him. (*Alistar*, *supra*, 115 Cal.App.4th at p. 128.)

Here, the investigator had received only sketchy tips, and vague assurances of cooperation, and had not successfully employed other resources to aid in defendant's capture. Although we strictly construe the relevant statutory provisions in favor of the surety, it is the surety who bears the burden of establishing that it falls within the statutory requirements for relief. (*Accredited*, *supra*, 137 Cal.App.4th at p. 1358.) Because the surety failed to carry its burden, the trial court did not abuse its discretion in denying the motion to extend the appearance period.

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.


GRIMES, J.

WE CONCUR:

RUBIN, Acting P. J.                    FLIER, J.